## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Brenda Engquist,                              Case No. 16-cv-3951 (TNL)

        Plaintiff,

v.                                              **ORDER**

Nancy A. Berryhill, Acting Commissioner
of Social Security,

        Defendant.

---

Frederick J. Daley, Jr., Daley Disability Law, 55 West Monroe Street, Suite 2440, Chicago IL 60603, and Edward C. Olson, Disability Attorneys of Minnesota, 331 Second Avenue South, Suite 420, Minneapolis MN 55401 (for Plaintiff); and

Pamela Marentette, Assistant United States Attorney, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis MN 55415 (for Defendant).

---

## I.   INTRODUCTION

Plaintiff Brenda Engquist brings the present action, contesting Defendant Commissioner of Social Security's denial of her application for disability insurance benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–34, and supplemental security income ("SSI") under Title XVI of the Social Security Act, 42 U.S.C. § 1381. The parties have consented to a final judgment from the undersigned United States Magistrate Judge in accordance with 28 U.S.C. § 636(c) and D. Minn. LR 7.2. This matter is before the Court on the parties' cross motions for summary judgment. For the reasons set forth below, the Court denies Plaintiff's motion and grants Defendant's motion.

## II.    BACKGROUND

### A.  Procedural History

Plaintiff filed the instant action for DIB and SSI on February 25, 2014, alleging a disability onset date of January 1, 2013. Plaintiff alleges impairments of: migraines; degenerative tissue in back; fibromyalgia; post-traumatic stress disorder; major depression; and generalized anxiety disorder. Plaintiff was found not disabled on May 21, 2014. That finding was affirmed upon reconsideration. Plaintiff then requested a hearing before an Administrative Law Judge. A hearing was held February 23, 2016 and, on March 14, 2016, the ALJ issued a decision denying Plaintiff's claim for benefits. Plaintiff sought review of the ALJ's decision through the Appeals Council, which denied her request for review. Plaintiff then sought review in this Court.

### B.  Administrative Hearing and ALJ Decision

The ALJ found that Plaintiff had the severe impairments of: "obesity; neck and back pain associated with degenerative changes of the cervico-thoracic and lumbro-sacral spine; hip pain associated with bilateral trochanteric bursitis; right shoulder pain; and fibromyalgia." (Tr. 35). The ALJ next found and concluded that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 42). The ALJ looked at Listings 1.02 (major dysfunction of a joint), 1.04 (disorders of the spine), 6.05 (chronic kidney disease), 5.05 (chronic liver disease), and 11.03 (epilepsy). (Tr. 42). Following this, the ALJ found Plaintiff to have the residual functioning capacity ("RFC") to perform a range of light work as defined in 20 C.F.R. §§ 404.1567(b), 416.967(b),

except she is "limited to no more than occasional overhead reaching bilaterally; she is limited to no more than occasional bending, twisting, crouching and crawling; and she is precluded from working on ladders and ropes and doing balancing activities." (Tr. 43). The ALJ next concluded that Plaintiff could perform past relevant work as a courier. (Tr. 54). Accordingly, Plaintiff was found not disabled from January 1, 2013 through March 14, 2016. (Tr. 55).

## III.   ANALYSIS

### A. Legal Standard

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. §§ 423(a)(1), 1381a; *accord* 20 C.F.R. §§ 404.315, 416.901. An individual is considered to be disabled if she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see also* 20 C.F.R. § 404.1505(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do her previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account her age, education, and work experience. 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B); *see also* 20 C.F.R. § 404.1505(a). Disability is determined according to a five-step, sequential evaluation process. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) she was severely impaired; (3) her impairment was, or was comparable to, a listed impairment; (4) she could perform past relevant work; and if not, (5) whether she could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010) (citing 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4)). In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 404.1512(a); *Thomas v. Sullivan*, 928 F.2d 255, 260 (8th Cir. 1991).

This Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole. *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011) (citing *Harris v. Barnhart*, 356 F.3d 926, 928 (8th Cir. 2004)); 42 U.S.C. § 405(g). "Substantial evidence means less than a preponderance but enough that a reasonable person would find it adequate to support the decision." *Boettcher*, 652 F.3d at 863 (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)). This standard requires the Court to "consider the evidence that both supports and detracts from the ALJ's decision." *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012) (citing *Ellis v. Barnhart*, 393 F.3d 988, 993 (8th Cir. 2005)).

The ALJ's decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Perks*, 687 F.3d at 1091 (citing *Pelkey v. Barnhart*, 433 F.3d 575, 578) (8th Cir. 2006)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, the court must affirm the [ALJ's] decision." *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001). In

4

reviewing the record for substantial evidence, the Court may not substitute its own judgment or findings of fact for that of the ALJ. *Hilkemeyer v. Barnhart*, 380 F.3d 441, 445 (8th Cir. 2004); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993). Likewise, courts "defer to the ALJ's determinations regarding the credibility of testimony, so long as they are supported by good reasons and substantial evidence." *Pelkey*, 433 F.3d at 578.

### B.  Plaintiff's Mental Impairments and Medical Opinions

The ALJ concluded Plaintiff's mental impairments—considered under Listings 12.04 (affective disorders) and 12.06 (anxiety related disorders)—"have not caused [Plaintiff] to be subject to more than minimal limitation in her ability to perform basic mental work activities for a continuous period of at least 12 months." (Tr. 35). Accordingly, the ALJ deemed Plaintiff's mental impairments as not severe. (Tr. 35–36). In so doing, the ALJ discussed Plaintiff's activities of daily living, social functioning, and concentration, persistence, and pace, finding mild limitation in all three categories, as well as noting Plaintiff experienced no episodes of decompensation. (Tr. 35–36).

Plaintiff's primary argument underpinning her action in this Court is that the ALJ erred in finding that none of her mental impairments were severe, discounting the opinions of Plaintiff's treatment providers and two state agency psychological consultants in the process. (ECF No. 19, at 20–29). Plaintiff asserts the ALJ ignored evidence that did not support a decision that Plaintiff's mental impairments are not severe and that no medical opinion in the record supports such a decision.

### 1.    Legal Standard

Under 20 C.F.R. §§ 404.1527(c), 416.927(c), medical opinions from treating sources are weighed using several factors: (1) the examining relationship; (2) the treatment relationship, such as the (i) length of the treatment relationship and frequency of examination and the (ii) nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) specialization; and (6) other factors. If a treating source's medical opinion on the nature and severity of a claimant's impairments is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record," it is given controlling weight. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2). Treating sources are defined as licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. 20 C.F.R. §§ 404.1513(a), 416.913(a). "A treating physician's opinion that a claimant is disabled or cannot be gainfully employed gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." *House v. Astrue*, 500 F.3d 741, 745 (8th Cir. 2007). An ALJ "may give a treating doctor's opinion limited weight if it provides conclusory statements only." *Samons v. Astrue*, 497 F.3d 813, 818 (8th Cir. 2007) (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1494 (8th Cir. 1995)). And "[a] treating physician's own inconsistency may . . . undermine his opinion and diminish or eliminate the weight given his opinions." *Hacker v. Barnhart*, 459 F.3d 934, 937 (8th Cir. 2006) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)).

## 2.    The Medical Opinions

Licensed Psychologist David Kearn completed a "Statement in Support of Disability (Mental)" form on January 24, 2014. (Tr. 412–15). Kearn estimated Plaintiff had a current GAF score of 50 and was unable to sustain full-time employment, particularly due to chronic, moderate to severe pain as well as acute anxiety symptoms. (Tr. 412). Kearn indicated Plaintiff's symptoms increased in severity starting January 2013. (Tr. 412). Kearn also completed a form entitled "Physician's Statement of Mental Impairments" on January 24, 2014. (Tr. 413–14). Kearn noted Plaintiff's current GAF was 50, with her highest GAF in the last year as 55. (Tr. 413). Kearn indicated Plaintiff had no or mild difficulty with remembering locations and work-like procedures, understanding and remembering very simple instructions, carrying out simple instructions, sustaining an ordinary routine without special instructions, and making simple work-related decisions. (Tr. 413). Kearn indicated Plaintiff had moderate difficulty in understanding and remembering complex instructions, dealing with stress of semi-skilled and skilled work, and working in coordination with or proximity to others without distraction. (Tr. 413). Kearn indicated Plaintiff had marked difficulty in maintaining attention and concentration for extended periods, maintaining regular attendance and being punctual, completing a normal workday/week without interruption from impairments, and performing at a consistent pace without unreasonable number of rests. (Tr. 413). Kearn noted Plaintiff had the following signs and symptoms due to her psychological impairments: appetite disturbance with weight change; sleep disturbance; mood disturbance; emotional lability; anhedonia; feelings of guilt/worthlessness;

difficulty thinking or concentrating; social withdrawal or isolation; blunt, flat, or inappropriate affect; decreased energy; intrusive recollections of a traumatic experience; generalized persistent anxiety; and irritability. (Tr. 413). Kearn indicated Plaintiff would have no or mild difficulty with asking simple questions or requesting assistance, being aware of normal hazards and taking appropriate precautions, and ability to understand, carry out, and remember simple instructions. (Tr. 413). Kearn indicated Plaintiff would have moderate difficulty responding appropriately to changes in routine work setting and accepting instructions and responding appropriately to criticism. (Tr. 413). Kearn indicated Plaintiff would have marked difficulty interacting appropriately with the public, interacting appropriately with co-workers/supervisors, and maintaining attention and concentration for extended periods. (Tr. 413). Kearn indicated Plaintiff experiences episodes of deterioration or decompensation due to acute onset of anxiety symptoms with feelings of panic and physical symptoms. (Tr. 414). Kearn reported Plaintiff would be off task due to her impairments 25% or more of the workday and would miss four or more days of work per month due to her impairments. (Tr. 414). Kearn did not indicate that Plaintiff's impairment met any of the Listed Impairments. (Tr. 414). Nor did Kearn list any symptoms or limitations that would affect Plaintiff's ability to work. (Tr. 414).

In evaluating Plaintiff's initial disability claim on May 21, 2014, the state psychological consultant, Licensed Psychologist Judy Strait, Psy.D. assessed Plaintiff's affective disorders and anxiety disorders as severe. (Tr. 100, 114). In looking at the "B" criteria of the Listings, Dr. Strait opined Plaintiff had mild restriction on activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties

in maintaining concentration, persistence, or pace, and no episodes of decompensation.

(Tr. 100, 114). In assessing Plaintiff's RFC, Dr. Strait noted Plaintiff's

> cognition is intact and concentration is impaired. She will have difficulty with complex tasks and demanding work environments. Her social functioning is reduced and she may not work well with the general public. She may work best alone or in a small, familiar group. Adaption is moderately impaired. [Plaintiff] retains the capacity to perform routine, 2-step tasks on a sustained basis. . . . The totality of the evidence does not reflect marked psych-related impairments.

(Tr. 105, 119).

On June 10, 2014, Dr. Joseph Richmond completed a form entitled "Medical Source Statement (Mental)." (Tr. 508–11). Dr. Richmond noted Plaintiff was diagnosed with PTSD and generalized anxiety disorder. (Tr. 508). Dr. Richmond rated Plaintiff as having a GAF score of 45 to 50, with 45 to 50 being her highest for the past year. (Tr. 508). Dr. Richmond noted Plaintiff had symptoms of: poor memory; sleep disturbance; mood disturbance; emotional lability; anhedonia or pervasive loss of interests; paranoia or inappropriate suspiciousness; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolation; decreased energy; generalized persistent anxiety; and irritability. (Tr. 508). Dr. Richmond noted Plaintiff's chronic pain exacerbates her mood symptoms. (Tr. 508, 510). Dr. Richmond noted Plaintiff was not taking any prescribed medications to treat her symptoms because "they made symptoms worse in the past." (Tr. 509). Dr. Richmond estimated Plaintiff would be off-task at work 25% or more per workday and would be absent from work four or more days per month. (Tr. 509). Dr. Richmond indicated Plaintiff would have moderate difficulties understanding and remembering very simple instructions and carrying out

simple instructions. (Tr. 509–10). Dr. Richmond noted Plaintiff would have marked difficulties in: remembering locations and work-like procedure; understanding and remembering complex instructions; maintaining attention and concentration for extended periods; sustaining an ordinary routine without special instructions; making simple work-related decisions; performing at a consistent pace without unreasonable rests; and completing a normal workday or workweek without interruption. (Tr. 509–10). Dr. Richmond indicated Plaintiff would have extreme difficulties maintaining regular attendance and being punctual, dealing with stress of semi-skilled and skilled work, and working in coordination with/proximity to others without distraction. (Tr. 509–10). In relation to responding to supervisors and co-workers, Dr. Richmond indicated Plaintiff would have moderate difficulties asking simple questions or requesting assistance. (Tr. 510). Dr. Richmond indicated Plaintiff would have marked difficulties accepting instructions and responding appropriately to criticism from supervisors, getting along with coworkers and peers without distracting them or exhibiting behavioral extremes, maintaining socially appropriate behavior in a work setting, adhering to basic standards of neatness and cleanliness, responding appropriately to changes in routine work setting, and being aware of normal hazard and taking appropriate precautions. (Tr. 510). Dr. Richmond indicated Plaintiff would have extreme difficulties interacting appropriately with the public. (Tr. 510). With respect to other functional limitations, Dr. Richmond noted Plaintiff would have moderate restriction on activities of daily living, marked difficulties with social functioning, and constant difficulties with concentration, persistence, or pace. (Tr. 510). Dr. Richmond indicated Plaintiff has continuous episodes

of decompensation, indicating Plaintiff experienced such episodes three times monthly, or 36 times in the past year. (Tr. 511). Dr. Richmond noted Plaintiff's impairments had been present since age 15. (Tr. 511).

Licensed Social Worker Annette Huff completed a form entitled "Medical Source Statement (Mental)" on June 23, 2014. (Tr. 512–15). Huff indicated Plaintiff had: poor memory; sleep disturbance; personality change; mood disturbance; emotional lability; recurrent panic attacks; anhedonia or pervasive loss of interests; paranoia or inappropriate suspiciousness for safety of daughter and self; feelings of guilt/worthlessness; difficulty thinking or concentrating; social withdrawal or isolation; decreased energy; obsessions or compulsions; intrusive recollections of a traumatic experience; generalized persistent anxiety; and irritability. (Tr. 512). Huff noted Plaintiff had no noted deficits in intellectual functioning. (Tr. 513). Huff opined Plaintiff would be off task 25% or more per workday and would miss 4 or more days of work per month due to her ailments. (Tr. 513). Huff opined Plaintiff had marked difficulties remembering locations and work-like procedure, understanding and remembering very simple instructions, carrying out simple instructions, making simple work-related decisions, and completing a normal workday or workweek without interruption. (Tr. 513–14). Huff opined Plaintiff had extreme difficulties understanding and remembering complex instructions, maintaining attention and concentration for extended periods, sustaining an ordinary routine without special instructions, dealing with stress of semi-skilled and skilled work, working in coordination with/proximity to others without distraction, and performing at a consistent pace without unreasonable rests. (Tr. 513–14). Huff indicated her opinion was based on

observation and no testing had been performed. (Tr. 514). Regarding interactions with others, Huff opined Plaintiff had no or mild difficulty adhering to basic standards of neatness and cleanliness. (Tr. 514). Huff indicated Plaintiff had moderate difficulties being aware of normal hazards and taking appropriate precautions. (Tr. 514). Huff indicated Plaintiff had marked difficulties interacting appropriately with the public, getting along with coworkers and peers without distracting them or exhibiting behavioral extremes, and maintaining socially appropriate behavior in a work setting. (Tr. 514). Huff noted Plaintiff had extreme difficulties accepting instructions and responding appropriately to criticism from supervisors and responding appropriately to changes in routine work setting. (Tr. 514). Turning to functional limitations, Huff opined Plaintiff had marked difficulties in activities of daily living, moderate difficulties in maintaining social functions, and constant difficulties in concentration, persistence, or pace. (Tr. 514). Huff did not know if Plaintiff had any episodes of decompensation. (Tr. 515).

In evaluating Plaintiff's disability claim on reconsideration on November 10, 2014, the state psychological consultant, Dr. Mary Sullivan, assessed Plaintiff's affective disorders and anxiety disorders as severe. (Tr. 131, 151). In looking at the "B" criteria of the Listings, Dr. Sullivan opined Plaintiff had mild restriction on activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, or pace, and no episodes of decompensation. (Tr. 131, 151). In assessing Plaintiff's RFC, Dr. Sullivan found there were no significant changes to Plaintiff's mental impairments, affirming Dr. Strait's RFC initial-stage assessment. (Tr. 137, 157).

### 3.      Discussion

At the onset, the Court notes Huff is not considered an "acceptable medical source" but instead an "other source" that the ALJ may use as evidence to show the severity of Plaintiff's impairments. 20 C.F.R. §§ 404.1513(d)(1), 406.913(d)(1). Because therapists and licensed social workers are not "acceptable medical sources," but instead "other medical sources," their opinions are not entitled to the greater weight afforded treating sources. *Lacroix v. Barnhart*, 465 F.3d 881, 886 (8th Cir. 2006). While therapists and licensed social workers like Huff are not generally entitled to treating-source weight, they are entitled to consideration. *Id.*; 20 C.F.R. §§ 404.1513(d)(1), 406.913(d)(1). "In determining what weight to give 'other medical evidence,' the ALJ has more discretion and is permitted to consider any inconsistencies found within the record." *Raney v. Barnhart*, 396 F.3d 1007, 1010 (8th Cir. 2005); *Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006); *cf.* Social Security Ruling 06–03p, 71 Fed.Reg. 45593, 45596 (stating that more weight may be given to the opinion of a medical source who is not an acceptable medical source if "he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion."). The factors set forth in 20 C.F.R. §§ 404.1527(c), 416.927(c), while directed at treating sources, can be applied when weighing opinion evidence from "other sources." SSR 06–03p, 71 Fed.Reg at 45595.

As noted, the ALJ concluded Plaintiff's mental impairments are not severe. In reaching this conclusion, the ALJ assigned "little evidentiary weight" to the opinions of the non-examining state agency psychological consultants, (Tr. 36), and the opinions of

licensed psychologist David Kearn, (Tr. 37–38), psychiatrist Dr. Joseph Richmond, (Tr. 37–38), and licensed social worker Annette Huff, (Tr. 38), as these opinions were not generally consistent with the evidence overall, particularly with Plaintiff's adult function report submitted in April 2014. (Tr. 36–42). The Court finds that the ALJ weighed the opinions of Kearn, Dr. Richmond, Huff, and the state agency psychological consultants in accordance with 20 C.F.R. §§ 404.1527(c), 416.927(c). Moreover, the weight given to each of these opinions by the ALJ is supported by substantial evidence in the record as a whole. The Court now turns to the factors found in 20 C.F.R. §§ 404.1527(c), 416.927(c).

### a.  Examining and Treating Relationship

There is no indication Kearn had any treating or examining relationship with Plaintiff. While Kearn appears to work with Dr. Richmond, (*see* Tr. 415), there are no treatment notes from Kearn in the record found by the Court, referenced by the ALJ, or cited by the parties. Instead, it appears Kearn's sole interaction with Plaintiff's mental health treatment was the drafting of his statement supporting her disability application. "The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003) (citing *Jenkins v. Apfel*, 196 F.ed 922, 925 (8th Cir. 1999)). Likewise, the state agency psychological consultants evaluated Plaintiff without examination. As such, the non-examining nature of Plaintiff's relationship with Kearn and the state agency psychologists serve as an unfavorable factor when weighing their opinions.

14

Conversely, Dr. Richmond and Huff both had extensive treatment relationships with Plaintiff. Dr. Richmond saw Plaintiff for therapy sessions approximately every two months. Huff saw Plaintiff much more frequently, often conducting therapy on a weekly or biweekly basis. As such, the examining and treatment relationships of Dr. Richmond and Huff are favorable when weighing their opinions.

### b.  Supportability and Consistency

The Court now turns to the supportability and consistency of the opinions. The ALJ primarily discounted all opinions based on their inconsistency with Plaintiff's self-completed Adult Function Report, dated April 16, 2014. (Tr. 317–24). The Court agrees that the medical opinions diverge from Plaintiff's self-reported abilities contained in the Adult Function Report.

Plaintiff indicated she does not follow written instructions well, needing to be shown how to do something and needing to read the instructions many times, but that with respect to spoken instructions, Plaintiff reported she could follow simple, one to two step instructions; with more complex instructions being difficult. (Tr. 322). Dr. Richmond opined that Plaintiff would have moderate difficulties understanding and remembering very simple instructions and carrying out simple instructions. Huff opined Plaintiff would have marked difficulties understanding, remembering, and carrying out very simply instructions. Conversely, Kearn indicated Plaintiff had no or mild difficulty with remembering locations and work-like procedures, understanding and remembering very simple instructions, carrying out simple instructions, sustaining an ordinary routine without special instructions, and making simple work-related decisions. The state

psychological consultants also opined that Plaintiff could perform routine, two-step tasks on a sustained basis.

Plaintiff reported interacting daily with her boyfriend, her daughter twice per month when she visits, and telephone calls about twice per month with her daughter. (Tr. 321). Plaintiff reported having problems getting along with others due to pain: "I don't take the time. The pain is so great. I just don't care to interact. People get on my nerves." (Tr. 322). Plaintiff reported having no problems getting along with authority figures and never being fired from a job because of problems getting along with others. (Tr. 323). Although, Plaintiff did report she has fears "about a lot of things," including being in crowds due to panic attacks and being around customers when she worked. (Tr. 323). Dr. Richmond and Kearn opined Plaintiff would have moderate difficulties in interacting with supervisors, marked difficulty in accepting instructions from supervisors, and extreme difficulties working in coordination or in proximity to others and interacting with the public. Kearn indicated Plaintiff would have marked difficulty interacting appropriately with the public and interacting appropriately with co-workers/supervisors. Dr. Richmond indicated Plaintiff would have marked difficulties accepting instructions and responding appropriately to criticism from supervisors, and getting along with coworkers and peers, as well as extreme difficulties interacting appropriately with the public. Huff opined Plaintiff would have extreme difficulties working in coordination or in proximity to others, marked difficulties interacting appropriately with the public, getting along with coworkers and peers without distracting them, and extreme difficulties interacting with supervisors. The state psychological consultants opined Plaintiff's social

functioning is reduced in that she may not work well with the public, but she could perform in small, familiar groups. Undercutting the opinions that Plaintiff could not work well with others, Plaintiff worked as a cashier from November 2012 to November 2013 for 7.5 hours per day for two days per week. (Tr. 325–26). In this position, she supervised one to two people for half of her shift. (Tr. 326). Supervision of others denotes an ability to interact with others that detracts from the opinions to the contrary.

Plaintiff reported no difficulties handling her finances. (Tr. 319). Plaintiff watches television and does crossword puzzles. (Tr. 321). Also, Plaintiff reported she could pay attention for 30 minutes and does not finish what she starts. (Tr. 322). Plaintiff stated, however, that it is pain, rather than any mental health concern, that makes tasks difficult such as memory, concentration, following instructions, and getting along with others. (Tr. 322). Indeed, when asked to describe her ailments, Plaintiff described them as physical in nature—back and neck pain that makes all physical activities difficult, including walking and sitting, and daily headaches. (Tr. 317). Plaintiff reported not needing reminders to take care of her personal needs or to take medicine, although she does forget sometimes. (Tr. 319). Dr. Richmond and Kearn indicated Plaintiff had marked difficulty in maintaining attention and concentration for extended periods. Huff opined Plaintiff would be off task 25% or more per workday and had extreme difficulties maintaining attention and concentration for extended periods. Plaintiff's reported activities and abilities detract from the opinions expressing marked and extreme difficulties maintaining attention and concentration.

Plaintiff reported some difficulties in dressing herself; showering three to four times per week, but "[d]epression makes it hard [and] it is just difficult and painful" because her "[b]alance is off" and it hurts to lift her arms up. (Tr. 318). Dr. Richmond indicated Plaintiff would have marked difficulty in adhering to basic standards of neatness and cleanliness and maintaining socially appropriate behavior. Throughout Plaintiff's visits with her treatment providers, however, Plaintiff was well-groomed and appropriately behaved. Moreover, Huff opined Plaintiff had no or mild difficulty in this area.

Kearn indicated Plaintiff experiences episodes of deterioration or decompensation due to acute onset of anxiety symptoms with feelings of panic and physical symptoms. Dr. Richmond indicated Plaintiff has continuous episodes of decompensation, indicating Plaintiff experienced such episodes three times monthly, or 36 times in the past year. Conversely, Huff did not know if Plaintiff had any episodes of decompensation and the state agency psychological consultants found no episodes of decompensation. Nor does the record show any hospitalizations related to mental health concerns.

These inconsistencies between the medical opinions and Plaintiff's self-reported capabilities and limitations detract from the opinions' value. And in looking at the medical record as a whole, the Court concludes the ALJ did not err in concluding the extreme limitations opined by Dr. Richmond and Huff, as well as Kearn and the state psychological consultants, are unsupported by the record.

On March 15, 2013, Plaintiff saw nurse practitioner SuZan Chandler on complaints of feeling ill for the past seven days. (Tr. 397–400). During this visit, Plaintiff

reported her "[a]nxiety is bad right now." (Tr. 397). On examination, Plaintiff's thought content appeared normal and she appeared anxious. (Tr. 398). Chandler only treated Plaintiff's physical ailments. (Tr. 398–400). One week later, on March 22, 2013, Plaintiff saw Chandler reporting she had a panic attack the night prior where she could not breath or swallow. (Tr. 401). Plaintiff reported not beginning the albuterol inhaler she was prescribed the week earlier to treat her breathing symptoms because "she's too afraid." (Tr. 401). Chandler prescribed a trial of lorazepam[1] for Plaintiff's anxiety/depression to last for approximately one month, as well as recommending therapy with a psychologist. (Tr. 403). On April 10, 2013, Plaintiff saw Chandler for a follow-up. (Tr. 405–07). Plaintiff reported some panic attacks and taking the lorazepam and using puzzle books to focus, which helps. (Tr. 405). Plaintiff reported she cannot go to work due to the panic attacks, unable to "deal with people," and feeling "really angry" sometimes and out of control of her life. (Tr. 405). Chandler prescribed Prozac[2] to treat Plaintiff's anxiety depression and Plaintiff was directed to begin therapy. (Tr. 406–07). Plaintiff saw Chandler for a follow-up on April 22, 2013. (Tr. 408–10). Plaintiff reported she had not started her Prozac because she "was confused and anxious about what may happen when she starts [it]." (Tr. 408). Plaintiff reported "[l]ots going on at home" as she was getting

---

[1] Lorazepam is "used to treat anxiety disorders. It is also used for short-term relief of the symptoms of anxiety or anxiety caused by depression. Lorazepam is a benzodiazepine that works in the brain to relieve symptoms of anxiety. Benzodiazepines are central nervous system depressants, which are medicines that slow down the nervous system." *Lorazepam (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/PMHT0010988/ (last visited March 20, 2018).

[2] Prozac is a brand name for fluoxetine, which is an SSRI (selective serotonin reuptake inhibitor) that "[t]reats depression, obsessive-compulsive disorder (OCD), bulimia nervosa, and panic disorder." *Fluoxetine (By mouth)*, PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/pubmedhealth/ PMHT0010346/?report=details (last visited March 20, 2018).

ready to move to a new home and was "greatly looked forward" to it. (Tr. 408). Plaintiff

agreed to start her Prozac that day. (Tr. 410).

Plaintiff saw nurse practitioner Sandra Moore on October 1, 2013 after a recent

consultation concerning her back/neck pain. (Tr. 488–90). Moore noted Plaintiff's issues

with lack of sleep and depression, noting "[s]he has several issues to work through that

may be contributing to her chronic pain." (Tr. 488). Plaintiff was "tearful at times

discussing her mental health." (Tr. 488). When Moore asked Plaintiff to "prioritize the

things that bother her the most [Plaintiff] indicate[d] lack of sleep and pain." (Tr. 488).

Plaintiff had a PHQ score for 17, indicating moderately severe depression, and a GAD

score of 16, indicating severe anxiety. (Tr. 488). On examination, Plaintiff was well

groomed, had appropriate attire, and good hygiene. (Tr. 489). Plaintiff had avoidant eye

contact, her speech was unremarkable, she was oriented to person, place, and time, her

mood was sad and anxious, and her insight and judgment were fair. (Tr. 489). Moore's

analysis was fibromyalgia with contributions from depression and anxiety. (Tr. 489).

Moore noted Plaintiff was "extremely anxious about taking medication to treat her

symptoms," but she agreed to a reduced dose of Cymbalta[3] and was referred to

counseling. (Tr. 489).

Plaintiff saw Dr. David Spight on October 23, 2013 for follow-up to a therapy

referral. (Tr. 440). Plaintiff noted she had been prescribed Cymbalta "but has not started

---

[3] Cymbalta is a brand name for duloxetine, which is used to treat "depression, anxiety, diabetic peripheral neuropathy, fibromyalgia, and chronic muscle or bone pain. This medicine is an SSNRI [selective serotonin-norepinephrine reuptake inhibitor]." *Duloxetine (By mouth)* PubMed Health, Nat'l Ctr. for Biotechnology Info., *available at* https://www.ncbi.nlm.nih.gov/ pubmedhealth/PMHT0010059/?report=details (last visited March 20, 2018).

it because of the potential side effects." (Tr. 440). Dr. Spight "had a long discussion [with Plaintiff] about the fact that most medications have a plethora of potential side effects; however, with that being said she may not experience any of those side effects." (Tr. 440). Dr. Spight also informed Plaintiff that if she has any side effects, she can notify Moore, who initially prescribed the medication. (Tr. 440). Dr. Spight recommended Plaintiff start the Cymbalta and return to physical therapy. (Tr. 440).

On October 24, 2013, Plaintiff saw Huff for a diagnostic assessment. (Tr. 451–53). Plaintiff endorsed symptoms of: sadness; mood swings; racing thoughts; difficulty concentrating; distractibility; indecisiveness; memory problems; loneliness; avoiding people; muscle tension; fatigue; sleep disturbance; sense of helplessness; hopelessness; restlessness; worthlessness; trembling; worrying; fear; panic episodes resulting from flashback memories, daydreams, and nightmares of past traumatic experiences; financial strain; and unresolved conflict with family. (Tr. 451, 453). Huff rated Plaintiff as having extreme anxiety and severe depression. (Tr. 452). Huff also assessed a PHQ9 score of 22, indicating a high level of depression. (Tr. 452). On examination, Plaintiff appeared comfortable, had depressed mood, flat affect, normal speech, and was fully oriented. (Tr. 452). Plaintiff's judgment and insight were intact, and her intelligence was rated as high. (Tr. 452). Huff summarized her impression, noting Plaintiff "jumped directly into core issues which have motivated her to seek services offering direct and honest details of clearly difficult information. [Plaintiff] demonstrate[d] insightful understanding and clear thinking about the childhood and life events creating her emotional disturbance." (Tr. 452). Plaintiff's thought process was logical and organized and she had no evidence

of delusions or hallucinations. (Tr. 452). Huff's diagnosis was: major depressive disorder, recurrent, severe without psychotic features; and posttraumatic stress disorder. (Tr. 453).

Plaintiff saw Huff for therapy on October 31, 2013. (Tr. 462). Plaintiff was tense and withdrawn. (Tr. 462). During therapy, Plaintiff "identified trauma triggers in [her] relationship with [her] mother." (Tr. 462). Huff and Plaintiff developed a treatment plan with long-term goals to stabilize Plaintiff's mood, relieve/resolve traumatic images, and repair self-esteem/image. (Tr. 454; *see also* Tr. 458).

Plaintiff saw Huff for therapy on November 5, 2013. (Tr. 463). Plaintiff reported some progress in her mental health status. (Tr. 463). Plaintiff was tense, heavy-hearted, and sad, noting her mind continually races and ruminates. (Tr. 463). Plaintiff reported public places overwhelm her. (Tr. 463). Huff provided calming strategies. (Tr. 463).

Plaintiff saw Huff for therapy on November 12, 2013. (Tr. 464). Plaintiff reported no change in her mental health status. (Tr. 464). Plaintiff was sad, angry, and withdrawn, stating she would like to alleviate her nightmares. (Tr. 464).

Plaintiff saw Huff for therapy on November 19, 2013. (Tr. 465). Plaintiff reported some progress in her mental health status. (Tr. 465). Plaintiff was sad with flat affect. (Tr. 465).

Plaintiff saw Huff for therapy on November 26, 2013. (Tr. 466). Plaintiff reported some progress in her mental health status. (Tr. 466). Plaintiff was withdrawn, guarded, and sad. (Tr. 466). Plaintiff reported that holidays trigger sad and hurtful memories. (Tr. 466).

Plaintiff saw Huff for therapy on December 3, 2013. (Tr. 467). Plaintiff reported some progress in her mental health status. (Tr. 467). Plaintiff reported the holiday season triggers anger and sadness, chest constrictions, and headaches. (Tr. 467).

Plaintiff saw Huff for therapy on December 17, 2013. (Tr. 468). Plaintiff reported regression in her mental health status. (Tr. 468). Plaintiff was sad and angry, noting a telephone call from an estranged brother was difficult. (Tr. 468).

Plaintiff saw Moore on December 18, 2013. (Tr. 497–99). Moore encouraged Plaintiff to take her Cymbalta, which was prescribed originally on October 1, 2013, as she believed it would also help Plaintiff with her chronic pain and moods, but Plaintiff indicated she had yet to start it but had "been thinking about it hard." (Tr. 497). Plaintiff was in counseling, but had yet to see a psychiatrist. (Tr. 497). Plaintiff asked Moore to complete a disability form from her lawyer because "she quit her job last week due to pain/anxiety symptoms." (Tr. 497). On examination, Plaintiff was well-groomed, had appropriate attire, and had good hygiene. (Tr. 498). Plaintiff made appropriate eye contact, her speech was unremarkable, she was oriented to person, place, and time, she was anxious, and she demonstrated fair insight and judgment. (Tr. 498). Moore discussed with Plaintiff that she needs to continue physical therapy and "start the cymbalta ASAP" because Moore believed the Cymbalta "will help with her mood and pain." (Tr. 498). Plaintiff stated "she doesn't like to take pills, but is considering it." (Tr. 498). Plaintiff reported she believed her moods were impacting her ability to work, with Moore reminding Plaintiff again that Cymbalta may help. (Tr. 498). Moore also offered SSRI/SNRI, but Plaintiff "will not consider." (Tr. 498). Moore referred Plaintiff to

psychiatry for evaluation and treatment and any disability evaluation related to moods. (Tr. 498). Moore also advised Plaintiff to continue counseling. (Tr. 498). Additionally, Moore indicated she "do[es] not think [Plaintiff] has exhausted pharmaceutical options for treatment, as she won't take antidepressants/anti anxiety meds, although she was in [physical therapy] and counseling. Will leave that determination to the consulting psychiatrist." (Tr. 498).

Plaintiff saw Huff for therapy on December 30, 2013. (Tr. 469). Plaintiff reported regression in her mental health status. (Tr. 469). Plaintiff was sad and withdrawn, reiterating her difficulty with the holiday season between January and April. (Tr. 469).

Plaintiff saw Moore on January 3, 2014. (Tr. 500–02). Plaintiff still had not started her Cymbalta prescription, but stated "she is going to take it today when she gets home." (Tr. 500).

Plaintiff saw Huff for therapy on January 6, 2014. (Tr. 470). Plaintiff had no change in her mental health status. (Tr. 470). Plaintiff was guarded and sad, and reported difficulties with her present relationship. (Tr. 470).

Plaintiff saw Huff for therapy on January 13, 2014. (Tr. 471). Plaintiff had some progress in her status. (Tr. 471). Plaintiff was guarded and cooperative. (Tr. 471). Plaintiff reported conversations with her significant other prompted motivation to face traumatic memories. (Tr. 471).

Plaintiff saw Huff for therapy on January 20, 2014. (Tr. 472). Plaintiff had no change in her mental health status. (Tr. 472). Plaintiff was angry and calm, with anger due in part to poor medication compliance. (Tr. 472).

24

Plaintiff saw Huff for therapy on February 6, 2014. (Tr. 473). Plaintiff had no change in her mental health status. (Tr. 473). Plaintiff was sad, withdrawn, and pessimistic, reporting an increase in panic episodes over the past two weeks due to increased medical appointments. (Tr. 473).

On February 7, 2014, Plaintiff saw Dr. Spight for consideration of injections into her cervical spine to treat back and neck pain. (Tr. 438–39). Plaintiff was seeing Dr. Spight because she was "experiencing frustration with her primary care provider, Sandra Moore, NP," who had referred Plaintiff for some second opinions concerning her spinal pain. (Tr. 438). Plaintiff reported Moore had prescribed Cymbalta, but she was "reluctant to take it because she has panic disorder and because of the potential side effects associated with the medication." (Tr. 438). Plaintiff told Dr. Spight she "did eventually try to the medication and then took it for two weeks and two days, but did experience light-headedness, gastrointestinal upset, and it increased her sensation of panic disorder, and she overall did not do well with the medication and subsequently discontinued it." (Tr. 438–39). Dr. Spight reminded Plaintiff that "an adverse reaction to one medication does not guarantee that she would have a similar reaction to similar medications." (Tr. 439). Dr. Spight found it a good idea that Plaintiff was being referred to a psychiatrist alongside her normal counseling. (Tr. 439). Dr. Spight opined that "it is going to be challenging for [Plaintiff] with the different specialists she is seeing to get her on the appropriate medication that will hopefully assist her in being more functional." (Tr. 439).

Plaintiff saw Huff therapy on February 10, 2014. (Tr. 474). Plaintiff had some progress in her mental health status. (Tr. 474). Plaintiff was hopeful and engaged. (Tr. 474). Plaintiff reported difficulties stemming from the multitude of medical appointments necessary for her social security benefits application, noting some providers have been unsympathetic to her attempts. (Tr. 474). Plaintiff was able to apply calming strategies to manage her fluctuating anxiety. (Tr. 474).

Plaintiff saw Huff for therapy on February 17, 2014. (Tr. 475). Plaintiff was tense, with flat affect and bitter mood. (Tr. 475). Plaintiff reported intrusive thoughts of childhood/adulthood abuse continued. (Tr. 475). Plaintiff reported bitterness triggered by medical providers and her medical conditions. (Tr. 475).

Plaintiff saw physician's assistant Amy McDaniel on February 26, 2014. (Tr. 503–04). Plaintiff told McDaniel she was started on Cymbalta, but did not tolerate it due to "dizziness, nausea, and 'feeling out of it.'" (Tr. 503). Plaintiff complained of anxiety and panic attacks, which were worse for the past two months. (Tr. 504). McDaniel prescribed a refill of Ativan[4] for Plaintiff to use as needed for her anxiety. (Tr. 503–04).

On March 13, 2014, Plaintiff had a psychiatric assessment with Dr. Richmond. (Tr. 432–35). Dr. Richmond assessed Plaintiff's active problems as generalized anxiety disorder, mild recurrent major depression, and post-traumatic stress disorder. (Tr. 432). Plaintiff indicated she preferred "not to be placed on meds at this time. She would like to see if psychotherapy is effective." (Tr. 432). Plaintiff endorsed some anhedonia, reported sleep was not restorative, occasional feelings of helplessness, hopelessness, and

---

[4] Ativan is a brand name for lorazepam. *See* note 1, *supra*.

worthlessness, reported she was anxious much of the time, and reported she was restless and irritable. (Tr. 433). Plaintiff reported never having seen a psychiatrist, but had been seeing Huff for therapy for the past three months. (Tr. 433). Plaintiff had no history of hypomania or mania, no hallucinations, and no psychiatric hospitalizations. (Tr. 433). Plaintiff had a PHQ9 score of 11. (Tr. 434). Examination showed Plaintiff was oriented to time, person, place, and situation; she had normal eye contact; appeared well groomed; had normal rate and rhythm of speech; depressed mood; appropriate affect; logical thought content; goal-directed thought process; intact insight/judgment; intact recent and remote memory; and focused attention span/concentration. (Tr. 434–35).

Dr. Spight drafted a letter to Plaintiff's attorney on March 14, 2014. (Tr. 437, 443). Dr. Spight indicated he supported Plaintiff's application for disability "as she does suffer from comorbid medical conditions, those being fibromyalgia, depression, and possibly panic disorder." (Tr. 437, 443). Dr. Spight opined Plaintiff's fibromyalgia was "currently not controlled. Multiple medications have been tried to-date without success." (Tr. 437, 443). This, Dr. Spight opined, would "in and of itself in [Plaintiff's] particular case" support Plaintiff's disability claim. (Tr. 437, 443). Dr. Spight continued, asserting that when Plaintiff's fibromyalgia was "compounded with depression and possibly panic disorder, it was [his] medical opinion that [Plaintiff] is not capable of gainful employment." (Tr. 437, 443).

Plaintiff saw Huff for therapy on March 17, 2014. (Tr. 476). Plaintiff had no change in her mental health status. (Tr. 476). Plaintiff was crying and angry, noting an incident with her daughter was creating significant distress. (Tr. 476).

Plaintiff saw Huff for therapy on March 24, 2014. (Tr. 477). Plaintiff had some progress in her mental health status. (Tr. 477). Plaintiff was sad and crying, reporting that the strain with her daughter was worked out, but the approaching anniversary of her mother's death was weighing upon her. (Tr. 477). Plaintiff was able to utilize regulatory and mindfulness skills to reduce her stress. (Tr. 477).

Plaintiff saw Huff for therapy on March 31, 2014. (Tr. 478). Plaintiff was sad, crying, and angry, indicating it was the week of the anniversary of her mother's death. (Tr. 478).

Plaintiff saw Huff for therapy on April 7, 2014. (Tr. 479). Plaintiff had no change in her mental health status. (Tr. 479). Plaintiff was calm. (Tr. 479). Plaintiff reported continued mild panic episodes once to twice weekly and continued grief. (Tr. 479).

Plaintiff saw Moore on April 9, 2014. (Tr. 505–06). Plaintiff reported she "tried cymbalta for 2 weeks and it made her super anxious." (Tr. 505).

Plaintiff saw Huff for therapy on April 21, 2014. (Tr. 616). Plaintiff was sad and crying. (Tr. 616). Plaintiff reported a "difficult conversation with a close friend" caused "two days of inability 'to do anything.'" (Tr. 616).

Plaintiff saw Huff for therapy on April 28, 2014. (Tr. 617). Plaintiff was sad, crying, and confused. (Tr. 617). Plaintiff reported repeated telephone calls from her brother "triggered a near panic episodes [sic] two days ago and an ongoing elevated emotional state." (Tr. 617). Plaintiff processed those phone calls in therapy, including stress regulation skills. (Tr. 617).

Plaintiff saw Dr. Richmond on May 13, 2014 for therapy. (Tr. 591–92). Plaintiff indicated she was in talk therapy and receiving EMDR (Eye Movement Desensitization and Reprocessing), but she was "not particularly fond of the EMDR and prefers talk therapy only." (Tr. 591). Dr. Richmond encouraged Plaintiff to follow through with the EDMR process because it may prove helpful. (Tr. 591). Plaintiff endorsed some anhedonia, her sleep was restorative, her energy level was ok, and she denied feeling helpless, hopeless, or worthless. (Tr. 591). On examination, Plaintiff was oriented to time, person, place, and situation, her eye contact was good, she was well-groomed, her speech had normal rate and rhythm, her mood was normal, her affect was appropriate, her thought content was logical and her thought process was goal directed, her insight and judgment were intact, her recent and remote memory were intact, and her attention span and concentration were focused. (Tr. 592). Dr. Richmond's assessment was generalized anxiety disorder, mild recurrent major depression, and post-traumatic stress disorder. (Tr. 591).

Plaintiff saw Huff for therapy on June 2, 2014. (Tr. 618). Plaintiff was sad, agitated, and frustrated, reporting that her medical providers "seem to be disagreeing how to best care for her medical conditions," her social security application was denied, and other problems related to her brother and significant other. (Tr. 618).

Plaintiff saw Huff for therapy on June 9, 2014. (Tr. 619). Plaintiff was sad with poor concentration. (Tr. 619).

Plaintiff saw Dr. Richmond for therapy and completion of disability forms on June 10, 2014. (Tr. 588–90). Plaintiff was "still reluctant to being placed on medication,"

stating that "she has been on psychotropics in the past and it made her mood s[ymptoms] worse." (Tr. 588). Plaintiff endorsed some anhedonia, her sleep was restorative, energy level was ok, and she was occasionally feeling helpless, hopeless, and worthless lately. (Tr. 589). Plaintiff indicated she could not work because of "severe panic attacks being around people. [N]ot only does she feel that her medical problems prevent her from working, but her uncomfortability being around others. She loses her ability to focus and concentrate well. The thought oftentimes of leaving her house causes severe panic." (Tr. 589). On examination, Plaintiff was oriented to time, person, place, and situation, her eye contact was normal, she was well-groomed, her speech had normal rate and rhythm, her mood was anxious and depressed, her affect was appropriate, her thought content was logical and her thought process was goal directed, her insight and judgment were intact, her recent and remote memory were intact, and her attention span and concentration were focused. (Tr. 589). Dr. Richmond's assessment was generalized anxiety disorder, mild recurrent major depression, and post-traumatic stress disorder. (Tr. 588).

Plaintiff saw Huff for therapy on June 23, 2014. (Tr. 620). Plaintiff was sad, angry, and distracted. (Tr. 620). Plaintiff reported increasing nightmares and intrusive thoughts. (Tr. 620).

Plaintiff saw Dr. Richmond on June 24, 2014 for therapy. (Tr. 585–86). Dr. Richmond noted there was no pharmacotherapy at Plaintiff's request. (Tr. 585). Plaintiff reported she "feels so overwhelmed with everything" as she was waiting for a social security decision and the impact her not working was having on her significant other. (Tr. 586). Dr. Richmond noted Plaintiff "recognizes she needs to deal with her past

30

traumas, but wants to place on hold until she can see what happens with Social Security."
(Tr. 586). Plaintiff endorsed some anhedonia, sleep was restorative, energy level was ok,
and she denied feeling helpless, hopeless, and worthless. (Tr. 586). On examination,
Plaintiff was oriented to time, person, place, and situation, her eye contact was normal,
she was well-groomed, her speech had normal rate and rhythm, her mood was normal,
her affect was appropriate, her thought content was logical and her thought process was
goal directed, her insight and judgment were intact, her recent and remote memory were
intact, and her attention span and concentration were focused. (Tr. 586–87). Dr.
Richmond's assessment was generalized anxiety disorder, mild recurrent major
depression, and post-traumatic stress disorder. (Tr. 585).

Plaintiff saw Huff for therapy on June 30, 2014. (Tr. 621). Plaintiff was engaged
in therapy, reporting "feeling somewhat better after use of distraction strategies
yesterday." (Tr. 621).

Plaintiff saw Huff for therapy on July 14, 2014. (Tr. 622). Plaintiff was sad and
crying, reporting having a "regression in emotion triggered by watching a movie about
unknown half siblings which has resulting [sic] in several panic episodes in the past two
weeks. (Tr. 622). In therapy, Plaintiff was able to process the triggering memories,
reducing her stress from 10/10 to 5/10. (Tr. 622).

Plaintiff saw Huff for therapy on July 21, 2014. (Tr. 623). Plaintiff was irritated,
reporting that road construction and a heat wave caused an increase in her physical pain
and discomfort, leading to the irritation. (Tr. 623). Through therapy, Plaintiff processed
her irritation and transitioned to a calm state. (Tr. 623).

Plaintiff saw Huff for therapy on July 28, 2014. (Tr. 624). Plaintiff was calm and relaxed. (Tr. 624).

Plaintiff saw Huff for therapy on August 4, 2014. (Tr. 625). Plaintiff was smiling and tense, reporting "some social contact which has brightened her emotional state." (Tr. 625).

Plaintiff saw Huff for therapy on August 18, 2014. (Tr. 626). Plaintiff was worried and sad, reporting she had an increase in panic episodes due to relationship strain with her significant other. (Tr. 626).

Plaintiff saw Huff for therapy on August 25, 2014. (Tr. 627). Plaintiff had mood disturbance due to strain with her daughter. (Tr. 627).

Plaintiff saw Dr. Richmond for therapy on August 26, 2014. (Tr. 582–84). Plaintiff stated she was feeling better and noted therapy was helpful. (Tr. 583). Plaintiff denied anhedonia, her anxiety symptoms were better controlled, and she was worrying less often. (Tr. 583). Plaintiff's sleep was restorative, her energy level was ok, and she denied feeling helpless, hopeless, or worthless. (Tr. 583). Plaintiff was oriented to time, person, place, and situation, her eye contact was normal, she was well-groomed, her speech had normal rate and rhythm, her mood was normal, her affect was appropriate, her thought content was logical and her thought process was goal directed, her insight and judgment were intact, her recent and remote memory were intact, and her attention span and concentration were focused. (Tr. 583). Dr. Richmond's assessment was generalized anxiety disorder, mild recurrent major depression, and post-traumatic stress disorder. (Tr. 582).

Plaintiff saw Huff for therapy on September 22, 2014. (Tr. 603). Plaintiff reported her depression was worsened, with increased symptoms of crying spells, withdrawing, and irritability. (Tr. 603). In therapy, Plaintiff was able to reduce her stress from 8/10 to 3/10. (Tr. 603).

Plaintiff saw Huff for therapy on September 29, 2014. (Tr. 604). Plaintiff reported increased panic episodes from zero to three or four per week. (Tr. 604).

Plaintiff saw Huff for therapy on October 6, 2014. (Tr. 605). Huff noted Plaintiff met the criteria for major depressive disorder, recurrent. (Tr. 605).

Plaintiff saw Dr. Richmond for therapy on October 24, 2014. (Tr. 579–81). Plaintiff reported her mood symptoms were unchanged, but then reported her chronic pain issues for the past 17 years worsened her mood symptoms. (Tr. 580). Plaintiff endorsed some anhedonia; her anxiety symptoms are better controlled and she is worrying less often. (Tr. 580). Plaintiff's sleep was restorative, her energy level was ok, and she denied feelings of helplessness, hopelessness, and worthlessness. (Tr. 580). On examination, Plaintiff was oriented to time, person, place, and situation, her eye contact was normal, she was well-groomed, her speech had normal rate and rhythm, her mood was depressed, her affect was appropriate, her thought content was logical and her thought process was goal directed, her insight and judgment were intact, her recent and remote memory were intact, and her attention span and concentration were focused. (Tr. 580–81). Dr. Richmond's assessment was generalized anxiety disorder, mild recurrent major depression, and post-traumatic stress disorder. (Tr. 579).

Plaintiff saw Huff for a diagnostic assessment on October 27, 2014. (Tr. 594–602). On examination, Plaintiff was well-groomed, her mood was irritable, her thought processes were logical and goal directed, her thought content was appropriate to mood and circumstances, her affect was appropriate, her judgment was intact, her speech was normal, her insight was good, and she was fully oriented. (Tr. 596–97). Huff noted Plaintiff's symptoms have improved over the past year. (Tr. 598). Huff's diagnosis was: major depressive disorder, mild; and posttraumatic stress disorder. (Tr. 598). Huff's prognosis was fair. (Tr. 598).

Plaintiff saw Huff for therapy on November 5, 2014. (Tr. 607). Plaintiff reported her overall mental health symptoms have been better because of vacation time taken over the previous week with her significant other. (Tr. 607).

Plaintiff saw Huff for therapy on November 10, 2014. (Tr. 670). Plaintiff had a sad and irritable mood. (Tr. 670). Plaintiff reported her relationship issues were continuing to improve. (Tr. 670).

Plaintiff saw Huff for therapy on November 17, 2014. (Tr. 671). Plaintiff was sad and angry because she had been denied social security benefits. (Tr. 671). Plaintiff was "able to successfully change her state and elevate her mood with application of distraction strategies." (Tr. 671).

Plaintiff saw Dr. Richmond for therapy on November 21, 2014. (Tr. 628–30). Plaintiff reported her mood symptoms were unchanged. (Tr. 629). Plaintiff endorsed some anhedonia. (Tr. 629). Plaintiff reported her anxiety symptoms were manageable, that she was worrying less often. (Tr. 629). Plaintiff reported her energy level was low;

she denied feeling helpless, hopeless, and worthless. (Tr. 629). Plaintiff was oriented to time, person, place, and situation, her eye contact was normal, she was well-groomed, her speech had normal rate and rhythm, her mood was depressed, her affect was appropriate, her thought content was logical and her thought process was goal directed, her insight and judgment were intact, her recent and remote memory were intact, and her attention span and concentration were focused. (Tr. 629–30). Dr. Richmond's assessment was generalized anxiety disorder, mild recurrent major depression, and post-traumatic stress disorder. (Tr. 628).

Plaintiff saw Huff for therapy on November 24, 2014. (Tr. 672). Plaintiff had constricted affect and a serious mood, reporting that weather changes affected her chronic pain. (Tr. 672). Plaintiff gained relief from her anger through therapy. (Tr. 672).

Plaintiff saw Huff for therapy on December 8, 2014. (Tr. 673). Plaintiff had an engaged, sober affect, which she relieved through therapy. (Tr. 673). Plaintiff also noted she was able to understand family dynamics with less distress. (Tr. 673).

Plaintiff saw Huff for therapy on December 15, 2014. (Tr. 674). Plaintiff presented with constricted affect, reporting that physical pain was causing discomfort alongside family troubles. (Tr. 674). Plaintiff reduced her stress through the session. (Tr. 674).

Plaintiff saw Huff for therapy on December 22, 2014. (Tr. 675). Plaintiff presented with sad and withdrawn affect, reporting distress caused by family strain and the death of her cat. (Tr. 675). Plaintiff, through therapy, gained "an understanding of why some dynamics are difficult for her." (Tr. 675).

35

Plaintiff saw Huff for therapy on January 5, 2015. (Tr. 676). Plaintiff presented with worried and sad affect due to relational and financial strain. (Tr. 676). Plaintiff reduced her stress from 9/10 to 5/10. (Tr. 676).

Plaintiff saw Huff for therapy on January 12, 2015. (Tr. 677). Plaintiff presented with withdrawn affect, reporting a rise in relational strain with her significant other. (Tr. 677). Plaintiff was smiling by the end of the session. (Tr. 677).

Plaintiff saw Dr. Richmond for therapy on January 16, 2015. (Tr. 631–33). Plaintiff reported her mood symptoms were unchanged and endorsed some anhedonia. (Tr. 632). Plaintiff was oriented to time, person, place, and situation, her eye contact was normal, she was well-groomed, her speech had normal rate and rhythm, her mood was depressed, her affect was appropriate, her thought content was logical and her thought process was goal directed, her insight and judgment were intact, her recent and remote memory were intact, and her attention span and concentration were focused. (Tr. 632–33). Dr. Richmond's assessment was generalized anxiety disorder, mild recurrent major depression, post-traumatic stress disorder, and mood disorder due to medical condition. (Tr. 631).

Plaintiff saw Huff for therapy on January 19, 2015. (Tr. 678). Plaintiff was discouraged and sad. (Tr. 678).

Plaintiff saw Huff for therapy on January 26, 2015. (Tr. 679). Plaintiff was withdrawn and sad. (Tr. 679).

Plaintiff saw Huff for therapy on February 2, 2015. (Tr. 680). Plaintiff had fidgeting behavior and discouraged mood. (Tr. 680). Plaintiff felt her depressive

symptoms were worsening because her significant other changed work shifts and she found it difficult to be alone. (Tr. 680). Plaintiff was able to reduce stress from 7/10 to 4/10. (Tr. 680).

Plaintiff saw Huff for therapy on February 9, 2015. (Tr. 681). Plaintiff had anxious behaviors; she was tense and worried. (Tr. 681). Plaintiff felt her grief rising as the anniversary date of her mother's death was approaching. (Tr. 681). Plaintiff endorsed that she "has made progress and is feeling like she has started to accept some of the circumstances which she has avoided for many years." (Tr. 681).

Plaintiff saw Huff for therapy on February 16, 2015. (Tr. 682). Plaintiff presented with a depressed mood, she was crying and frustrated due to her relationship with her daughter. (Tr. 682).

Plaintiff saw Dr. Richmond for therapy on February 20, 2015. (Tr. 634–36). Plaintiff had low mood, endorsed some anhedonia, and reported her anxiety symptoms were manageable and that she was worrying less often. (Tr. 635). Plaintiff was oriented to time, person, place, and situation, her eye contact was normal, she was well-groomed, her speech had normal rate and rhythm, her mood was depressed, her affect was appropriate, her thought content was logical and her thought process was goal directed, her insight and judgment were intact, her recent and remote memory were intact, and her attention span and concentration were focused. (Tr. 635–36). Dr. Richmond's assessment was generalized anxiety disorder, mild recurrent major depression, post-traumatic stress disorder, and mood disorder due to medical condition. (Tr. 634).

Plaintiff saw Huff for therapy on March 2, 2015. (Tr. 683). Plaintiff presented as mildly distressed about her relationship, financial strain, physical pain, and her social security application. (Tr. 683).

Plaintiff saw Huff for therapy on March 13, 2015. (Tr. 684). Plaintiff was angry and frustrated due to sibling strain. (Tr. 684). Plaintiff was able to reduce her stress from 9/10 to 5/10. (Tr. 684).

Plaintiff saw Dr. Richmond for therapy on March 20, 2015. (Tr. 640–42). Plaintiff's mood was low and endorsed some anhedonia. (Tr. 641). Plaintiff reported her anxiety symptoms were manageable and she was worrying a bit more. (Tr. 641). Plaintiff was oriented to time, person, place, and situation, her eye contact was normal, she was well-groomed, her speech had normal rate and rhythm, her mood was depressed, her affect was appropriate, her thought content was logical and her thought process was goal directed, her insight and judgment were intact, her recent and remote memory were intact, and her attention span and concentration were focused. (Tr. 641–42). Dr. Richmond's assessment was generalized anxiety disorder, mild recurrent major depression, post-traumatic stress disorder, and mood disorder due to medical condition. (Tr. 640).

Plaintiff saw Huff for therapy on March 23, 2015. (Tr. 685). Plaintiff presented with discouraged and irritated affect. (Tr. 685).

Plaintiff saw Huff for therapy on April 6, 2015. (Tr. 686). Plaintiff had a sad, irritated state. (Tr. 686). Plaintiff endorsed little change "primarily because of physical pain." (Tr. 686).

Plaintiff saw Huff for therapy on April 20, 2015. (Tr. 687). Plaintiff presented with distressed, sad, and crying affect which she attributed to relational distress. (Tr. 687).

Plaintiff saw Huff for therapy on April 27, 2015. (Tr. 688). Plaintiff had an angry and irritated mood, reporting a high level of physical pain and relational stress. (Tr. 688). Through therapy, Plaintiff "acknowledge[d] she has some means to relieve emotional distress." (Tr. 688).

Plaintiff saw Dr. Richmond for therapy on May 1, 2015. (Tr. 643–45). Plaintiff's mood was low and she endorsed some anhedonia. (Tr. 643). Plaintiff reported her anxiety level was increasing because of her underlying stress related to the social security application. (Tr. 643). Plaintiff was oriented to time, person, place, and situation, her eye contact was normal, she was well-groomed, her speech had normal rate and rhythm, her mood was normal, her affect was appropriate, her thought content was logical and her thought process was goal directed, her insight and judgment were intact, her recent and remote memory were intact, and her attention span and concentration were focused. (Tr. 644). Dr. Richmond's assessment was generalized anxiety disorder and mood disorder due to medical condition. (Tr. 643).

Plaintiff saw Huff for therapy on May 4, 2015. (Tr. 689). Plaintiff "presented in an irritated, calm state." (Tr. 689). Plaintiff discussed using self-awareness as a means to reduce tension. (Tr. 689). Huff noted Plaintiff has "difficulty believing building tolerance is possible with worsening chronic pain and unchanging relational dynamics." (Tr. 689).

Plaintiff acknowledged improvement will occur when her social security application is decided. (Tr. 689).

Plaintiff saw Huff for therapy on May 11, 2015. (Tr. 690). Plaintiff was in an irritated state, she was frustrated and discouraged. (Tr. 690). Huff introduced Plaintiff to a therapy technique which Plaintiff was willing to apply. (Tr. 690).

Plaintiff saw Huff for therapy on June 1, 2015. (Tr. 691). Plaintiff was angry related to a familial strain with her daughter and delay in her social security application. (Tr. 691). Huff was unable to get Plaintiff to understand her daughter's point of view. (Tr. 691).

Plaintiff saw Dr. Richmond for therapy on June 5, 2015. (Tr. 646–48). Plaintiff endorsed some anhedonia, noting her chronic pain syndrome exacerbated her mood symptoms. (Tr. 646). Plaintiff reported her anxiety level "is mounting in anticipation of a decision" concerning her social security application, she "is still worrying about everything, quite a bit." (Tr. 646). Plaintiff denied any panic symptoms. (Tr. 646). Plaintiff was oriented to time, person, place, and situation, her eye contact was normal, she was well-groomed, her speech had normal rate and rhythm, her mood was anxious and depressed, her affect was appropriate, her thought content was logical and her thought process was goal directed, her insight and judgment were intact, her recent and remote memory were intact, and her attention span and concentration were focused. (Tr. 647). Dr. Richmond's assessment was generalized anxiety disorder, mood disorder due to medical condition, and panic disorder. (Tr. 646).

Plaintiff saw Huff for therapy on June 8, 2015. (Tr. 692). Plaintiff was angry. (Tr. 692). Plaintiff was able to reduce her stress from 10/10 to 5/10 in therapy and recognize the "distorted emotional and mental state" of the family member causing the stress. (Tr. 692). Plaintiff was "able to acknowledge the need for strengthening her regulatory skills." (Tr. 692).

Plaintiff saw Huff for therapy on June 15, 2015. (Tr. 693). Plaintiff was in an angry and sad state due to familial strain. (Tr. 693).

Plaintiff saw Huff for therapy on July 13, 2015. (Tr. 935). Plaintiff presented with tense affect, reporting that weather changes increased her physical pain. (Tr. 935). Plaintiff reported her relational strain had improved. (Tr. 935). Plaintiff reported she had periodic panic episodes "in crowds such as WalMart." (Tr. 935).

Plaintiff saw Huff for therapy on July 27, 2015. (Tr. 936). Plaintiff presented in an angry, agitated state. (Tr. 936). Through therapy, Plaintiff was able to reduce her stress from 9/10 to 5/10. (Tr. 936).

Plaintiff saw Huff for therapy on August 3, 2015. (Tr. 937). Plaintiff was in an irritated state. (Tr. 937). Plaintiff reported she was "starting to recognize obsessive and repetitive thought and behavior patterns she is using and had been using for many years to relieve distress." (Tr. 937). Plaintiff "was willing to consider trying new methods . . . to reduce her anger, ruminating thoughts, and repetitive behaviors." (Tr. 937). Plaintiff was also "willing to consider that her anger has become a barrier to progress." (Tr. 937).

Plaintiff saw Huff for therapy on August 10, 2015. (Tr. 938). Plaintiff was in an angry state, reporting little had changed. (Tr. 938). Plaintiff "acknowledge[d] she has little motivation to focus on much until after SSDI is determined." (Tr. 938).

Plaintiff saw Huff for therapy on August 31, 2015. (Tr. 939). Plaintiff was in an angry, withdrawn state where she was fidgeting and tense following an argument with her significant other. (Tr. 939). Through therapy, Plaintiff was able to reduce her stress from 9/10 to 4/10. (Tr. 939).

Plaintiff saw Huff for therapy on September 14, 2015. (Tr. 940). Plaintiff was in an irritable mood, dissatisfied, and aggravated. (Tr. 940).

Plaintiff saw Huff for therapy on September 21, 2015. (Tr. 941). Plaintiff presented in a depressed and angry state. (Tr. 941).

Plaintiff saw Huff for therapy on September 28, 2015. (Tr. 942). Plaintiff was in an angry state. (Tr. 942). Plaintiff was able to reduce her stress from 8/10 to 5/10, but had difficulty sustaining mental focus on mindfulness skills due to physical pain. (Tr. 942).

Plaintiff saw Huff for therapy on October 19, 2015. (Tr. 943). Plaintiff was able to reduce her stress symptoms from moderately to mildly dissatisfied. (Tr. 943).

Plaintiff completed a diagnostic assessment with Huff on October 26, 2015. (Tr. 911–18). Plaintiff's current stressors for her depressive and post-traumatic stress disorders include financial strain and relational strain exacerbated by physical pain. (Tr. 911). Plaintiff reported her grief/loss had improved, but anniversary dates continued to be difficult. (Tr. 911). Plaintiff reported her medical concerns limit social interaction, but she does maintain contact with a childhood friend with whom she "communicates

regularly and visits a few times per year." (Tr. 912). Plaintiff reported enjoying riding motorcycles with her significant other and meeting friends and acquaintances while out on the road. (Tr. 912). Plaintiff socializes with her daughter and nieces, as well as her significant other's mother. (Tr. 912). Plaintiff reported her physical pain distresses her mood. (Tr. 913). Plaintiff was not on any medications. (Tr. 914). On examination, Plaintiff was well-groomed, had angry mood, flat affect, normal speech, agitated motor activity, fully oriented, logical and goal-directed thought processes, appropriate thought content, her judgment was intact and fair, and her insight was partial and good. (Tr. 915). Huff's assessment was that post-traumatic stress disorder continued "to be supported by [Plaintiff's] report of symptoms." (Tr. 916). Huff updated Plaintiff's depressive disorder from mild to severe "based on symptoms reported by [Plaintiff] and severity supported by PHQ-9 (15) and GAD (16) scores." (Tr. 916). Huff indicated that "[s]ince the onset of present concerns, [Plaintiff's] functioning has declined or worsened in Mental Health Symptoms, Interpersonal Functioning, Family Relationships, Academic/Work." (Tr. 916). Huff's diagnosis was chronic post-traumatic stress disorder and recurrent, severe major depressive disorder. (Tr. 919). In Huff's treatment plan following this renewed diagnostic assessment, she indicated Plaintiff's relationships were stable as of July 27, 2015. (Tr. 922, 926). Rather, Plaintiff was to focus on reducing stress from financial and medical circumstances. (Tr. 922, 926). As of November 2, 2015, Plaintiff had made "intermittent progress in depressive symptoms" which was "disrupted by worsening physical pain." (Tr. 932–33).

Plaintiff saw Huff for therapy on November 2, 2015. (Tr. 944). Plaintiff was discouraged, withdrawn, and with flat affect. (Tr. 944). Huff assessed Plaintiff's depressive symptoms as moderate to severe, complicated by physical pain. (Tr. 944).

Plaintiff saw Huff for therapy on November 16, 2015. (Tr. 945). Plaintiff reported her outlook was improved following recent hip treatment and recent financial decisions of her significant other. (Tr. 945). Huff assessed Plaintiff's depressive symptoms as having improved, noting a decrease in sadness and irritability and an increase in motivation and trust. (Tr. 945).

Plaintiff saw Huff for therapy on November 23, 2015. (Tr. 946). Huff assessed Plaintiff's depressive symptoms as improved as demonstrated by improved mood and cognitive focus, although irritability, withdrawing, and low motivation remained present. (Tr. 946).

Plaintiff saw Huff for therapy on November 30, 2015. (Tr. 947). Plaintiff had a mildly depressed state and flat affect. (Tr. 947). Plaintiff was in a mildly depressed state with flat affect. (Tr. 947). Plaintiff reported holiday gatherings have been nice but also made her angry in some respects. (Tr. 947). Plaintiff endorsed some relief through therapy. (Tr. 947).

Plaintiff saw Huff for therapy on December 7, 2015. (Tr. 948). Plaintiff's mood was lifted after receiving a disability hearing date. (Tr. 948).

Plaintiff saw Huff for therapy on December 14, 2015. (Tr. 949) Plaintiff was in a withdrawn state, citing the weather change and holidays as affecting her symptoms.

(Tr. 949). Huff assessed depressive symptoms as demonstrated by Plaintiff's sadness, irritability, and avoidance of traumatic triggers and reminders. (Tr. 949).

Plaintiff saw Huff for therapy on January 11, 2016. (Tr. 950). Plaintiff presented in a sad, withdrawn state. (Tr. 950). Plaintiff became "more agitated and worried and she discussed the oncoming [disability hearing] date. She was able to distract and calm herself . . ." (Tr. 950).

One continuous thread throughout Plaintiff's mental health treatment is her refusal to take medications that could alleviate her ailments. Plaintiff did not comply with her medical providers' pharmacological advice to treat her anxiety and depression, even when those providers repeatedly encouraged Plaintiff to try medication for months and even offered alternatives to allay her fears. *See Owen v. Astrue*, 551 F.3d 792, 800 (8th Cir. 2008) (claimant's noncompliance with medical treatment can constitute evidence that is inconsistent with a medical opinion). Outside of some trial dosages of lorazepam, Plaintiff was prescribed Cymbalta to treat her anxiety symptoms, but it could have also helped with her fibromyalgia. *See note 3, supra*. Plaintiff purportedly took the prescribed Cymbalta some four months after-the-fact, but discontinued it herself almost immediately thereafter without consulting her medical providers. Plaintiff then refused alternative medications to treat her mental health impairments. By the time she completed her Adult Function Report, Plaintiff reported she was taking no medications and that she "stopped taking [her] depression medications because of the side effects." (Tr. 324). "If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Wildman v. Astrue*, 596 F.3d 959, 965 (8th Cir. 2010) (quoting *Brown v.*

*Barnhart*, 390 F.3d 535, 540) (8th Cir. 2004)). At one point, Dr. Spight reminded Plaintiff that even if she had an adverse reaction to one medication, such as Cymbalta, other medications may not have similar side effects. There is also no indication that Plaintiff refused to take medications as a result of her mental health impairments themselves. *See Pate-Fires v. Astrue*, 564 F.3d 935, 946–47 (8th Cir. 2009) (finding the ALJ erred in rejecting a medical opinion based on claimant's noncompliance with mental health treatment where noncompliance was attributable to claimant's well-documented severe mental impairments). This is particularly true where the record demonstrates Plaintiff was willing to take medications to treat her pain-causing ailments. As such, the mental impairments opined by Dr. Richmond, Huff, Kearn, and the state agency psychological consultants and alleged by Plaintiff cannot be considered disabling given Plaintiff's course of treatment.

The ALJ's finding that Plaintiff's mental impairments are non-severe, as compared to the severe limitations opined by Dr. Richmond, Huff, and Kearn, is supported by substantial evidence in the record as a whole. Plaintiff continued regularly with conservative mental health treatment and even though she refused to participate in pharmaceutical-based treatment options, she showed progress through talk therapy, often demonstrating an ability to lower her stress levels through techniques taught by Huff. Moreover, Plaintiff's mental health impairments were often tied to situational stressors, such as arguments with her significant other or family members, the anniversary of her mother's death, and her social security application. Such situational stressors do not rise to the level of severe mental impairment, *see Dunahoo v. Apfel*, 241 F.3d 1033, 1040–41

(8th Cir. 2001), particularly where Plaintiff demonstrated improvement via therapy during and beyond these situational stressors, *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) ("The medical record supports the conclusion that any depression experienced by Gates was situational in nature, related to marital issues, and improved with a regimen of medication and counseling.").

### 4.    Conclusion

When considering Plaintiff's mental impairments and their effect on Plaintiff's functioning, the ALJ found mild limitation in activities of daily living, mild limitation in social functioning, mild limitation in concentration, persistence, or pace, and no episodes of decompensation. (Tr. 35–36). These findings are consistent with Plaintiff's self-reported abilities in the Adult Function Report as well as other evidence in the medical record. Regarding activities of daily living, Plaintiff reported living at home with her significant other, completing a range of chores around the home, an ability to perform personal care needs, no difficulties handling her finances, and an ability to drive a car, together with an indication that she enjoyed riding motorcycles with her significant other and meeting friends and acquaintances while on the road. (Tr. 317–22, 912). With respect to social functioning, Plaintiff has maintained a relationship with her significant other, including going on vacation, spending time with her daughter and nieces and other family, talking on the telephone several times monthly, meeting with friends and acquaintances, and maintaining regular contact with a childhood friend whom she visits a few times per year. (Tr. 317–22, 607, 625, 912). Concerning concentration, persistence, and pace, Plaintiff can handle her own finances, completes crossword puzzles, watches

television, uses calendars to set reminders, she worked as a cashier for nearly all of 2013, and completes chores with breaks due to pain rather than mental impairments. (Tr. 317–26, 405). As noted above, there is no evidence of evidence of decompensation in the medical record. Plaintiff's self-reported abilities are inconsistent with the medical opinions offered, undermining them. *Toland v. Colvin*, 761 F.3d 931, 936 (8th Cir. 2014). Put another way, Plaintiff's admitted abilities suggest she is more capable than her doctors believe. *Id.*

In sum, the ALJ did not err in assigning little weight to the opinions of Kearn, Huff, Dr. Richmond, and the state psychological consultants, and the ALJ's weighing of these opinions is supported by substantial evidence in the record as a whole. Further, the ALJ's determination that Plaintiff's mental impairments are non-severe is supported by substantial evidence in the record as a whole.

### C. Other Medical Opinions

Besides the medical opinions related to Plaintiff's mental health, Plaintiff also argues that the ALJ erred in discounting the medical opinions of three other treating physicians: Dr. Spight, Christopher Dockter, D.C., and Dr. Joseph Lind. (ECF No. 19, at 27–29). Plaintiff asserts these opinions were improperly weighed according to 20 C.F.R. §§ 404.1527(c), 416.927(c). (ECF No. 19, at 27–29). These opinions all relate to Plaintiff's physical limitations, and Plaintiff only asserts the ALJ erred in failing to take into account her mental impairments, making no argument as to the ALJ's determination of Plaintiff's objective physical impairments.

Dockter completed a "Medical Source Statement (Cervical Spine)" form on September 11, 2014. (Tr. 530–33). Dockter reported Plaintiff's ailments as severe neck, mid back, and low back pain. (Tr. 530). Dockter indicated Plaintiff's prognosis was permanent pain due to moderate to advanced degenerative changes throughout her spine. (Tr. 530). Dockter opined Plaintiff had 50% decrease in lumbar extension, flexion, and lateral bending, and 30% decrease in rotation. (Tr. 531). Dockter noted severe headache pain one to two times per week which has been reduced by chiropractic care. (Tr. 531). Dockter noted Plaintiff is unable to perform simple activities of daily living without assistance due to her pain, such as cleaning, dishes, and laundry. (Tr. 531). Dockter opined Plaintiff could walk two blocks without rest or pain, sit for 20 minutes without needing to shift positions, and stand for 10 minutes without needing to sit or shift positions. (Tr. 531). Dockter opined Plaintiff could sit two to three hours per eight-hour workday, stand one to two hours per eight-hour workday, and necessitated shifting positions at will. (Tr. 531). Dockter opined Plaintiff needs 15-20 minute breaks every hour. (Tr. 532). Dockter opined Plaintiff could lift 20 pounds rarely, and less than 10 pounds occasionally. (Tr. 532). Dockter opined Plaintiff could occasionally balance, rarely stoop or bend, crouch or squat, climb ramps or stairs, kneel/crawl/crouch, and turn or twist, and never climb ladders or scaffolds. (Tr. 532). Dockter opined Plaintiff could occasionally hold her head in a static position, turn her head, look up, and look down. (Tr. 532). Dockter opined Plaintiff had no limitation with her hands and fingers in grasping, turning, and, twisting objects and fine manipulation, and could use her arms in reaching in front and overhead 10% of the workday. (Tr. 532). Dockter opined Plaintiff

would be off-task 20% of the day and would be absent four or more days per month due to her ailments. (Tr. 532).

Plaintiff, through her brief, challenges the ALJ's determination as to her mental impairments and subjective pain complaints. While Plaintiff asserts that the ALJ improperly weighed the opinion of Dockter, she fails to explain *how* the ALJ erred in weighing Dockter's opinion or how it would have impacted the ALJ's disability determination. Unlike the opinions of the mental health providers, Dockter's opinion has no impact upon the ALJ's decision that Plaintiff's mental health impairments are non-severe. Furthermore, while the ALJ did not adopt Dockter's opinion wholesale, the RFC incorporates some of Dockter's opinion. The RFC limited Plaintiff to "no more than occasional overhead reaching bilaterally; she is limited to no more than occasional bending, twisting, crouching and crawling; and she is precluded from working on ladders and ropes and doing balancing activities." (Tr. 43). Nor can Dockter's opinion bear upon Plaintiff's remaining argument concerning subjective pain complaints, as that argument relies, necessarily, upon Plaintiff's *subjective* complaints, not Dockter's opinion as to her capabilities. Thus, the Court cannot determine from Plaintiff's scant argument what exactly Plaintiff is challenging with respect to Dockter. Undeveloped arguments such as this are waived. *Aulston v. Astrue*, 277 Fed. Appx. 663, 664–65 (8th Cir. 2008) (citing *SmithKline Beecham Corp. v. Apotex Corp.*, 439 F.3d 1312, 1320 (Fed. Cir. 2010)).

Plaintiff's arguments as to the opinions of Dr. Lind and Dr. Spight meet the same fate: they are undeveloped and thus waived. Nevertheless, Plaintiff's broad assertion that the ALJ erred in weighing these opinions fails on a second, independent ground. Dr. Lind

saw Plaintiff on August 15, 2014. (Tr. 523). The treatment notes discuss that Plaintiff is not currently working because "[b]etween [fibromyalgia], hip bursitis, back pain and neck pain she is not able to work. Working with lawyer to get disability." (Tr. 523). These notes appear to be Plaintiff's self-reported status more than Dr. Lind's opinion. Even if the August 15, 2014 treatment notes from Dr. Lind were considered an opinion, an opinion that a claimant is unable to work "gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." *House*, 500 F.3d at 745. Moreover, Dr. Lind offers no opinion as to Plaintiff's capabilities and limitations, or the nature and severity of her impairments. As such, the ALJ did not err in affording "little evidentiary weight," (Tr. 53–54), to Dr. Lind's August 15, 2014 opinion.

As discussed above, Dr. Spight drafted a letter to Plaintiff's attorney on March 14, 2014. (Tr. 437, 443). Dr. Spight indicated he supported Plaintiff's application for disability "as she does suffer from comorbid medical conditions, those being fibromyalgia, depression, and possibly panic disorder." (Tr. 437, 443). Dr. Spight opined Plaintiff's fibromyalgia was "currently not controlled. Multiple medications have been tried to-date without success." (Tr. 437, 443). This, Dr. Spight opined, would "in and of itself in [Plaintiff's] particular case" support Plaintiff's disability claim. (Tr. 437, 443). Dr. Spight continued, asserting that when Plaintiff's fibromyalgia was "compounded with depression and possibly panic disorder, it was [his] medical opinion that [Plaintiff] is not capable of gainful employment." (Tr. 437, 443). As with Dr. Lind, an opinion that a claimant is unable to work "gets no deference because it invades the province of the Commissioner to make the ultimate disability determination." *House*, 500 F.3d at 745.

Also similar to Dr. Lind, Dr. Spight offers no opinion as to the nature and severity of Plaintiff's ailments and their impact on her capabilities. Finally, the record supports the ALJ's skepticism of Dr. Spight's opinion because there is substantial evidence in the record as a whole that while Plaintiff had been prescribed numerous medications over time, her compliance with her prescribed medication regiment was deficient. Accordingly, the ALJ did not err in affording "little evidentiary weight," (Tr. 53–54), to Dr. Spight's March 14, 2014 opinion.

Therefore, the Court concludes Plaintiff's arguments that the ALJ improperly weighed the opinions of Dockter, Dr. Lind, and Dr. Spight are waived. Even if the arguments as to Dr. Lind and Dr. Spight were not waived, they lack merit because Dr. Lind and Dr. Spight's opinions invade upon the province of the Commissioner to make disability determinations, and substantial evidence exists in the record to support the ALJ's allocation of evidentiary weight.

### D. Plaintiff's Subjective Symptoms and Their Effects

Plaintiff argues the ALJ erred by not properly evaluating her subjective symptoms and their effect on her ability to work. (ECF No. 19, at 29–34). Plaintiff admits the ALJ "provide[d] the pertinent regulations," but asserts the ALJ did not provide a clearly articulated credibility analysis. (ECF No. 19, at 30–31). Plaintiff's argument rests mainly upon the ALJ's analysis of Plaintiff's daily activities. (ECF No. 19, at 29–33).

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." *Holmstrom v. Massanari*, 270 F.3d 715, 721 (8th Cir. 2001). The ALJ

must give full consideration to all of the evidence presented relating to
subjective complaints, including the claimant's prior work record, and
observations by third parties and treating and examining physicians relating
to such matters as: (1) the claimant's daily activities; (2) the duration,
frequency and intensity of the pain; (3) precipitating and aggravating
factors; (4) dosage, effectiveness and side effects of medication; [and] (5)
functional restrictions.

*Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The ALJ "need not explicitly

discuss each *Polaski* factor," and it is sufficient that she "acknowledges and considers

those factors before discounting a claimant's subjective complaints." *Strongson v.*

*Barnhart*, 361 F.3d 1066, 1072 (8th Cir. 2004). "If an ALJ explicitly discredits the

claimant's testimony and gives good reason for doing so," courts "will normally defer to

the ALJ's credibility determination." *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir.

2003).

Here, the Court concludes the ALJ carefully considered the medical record when

determining Plaintiff's RFC. In so doing, the ALJ considered the *Polaski* factors in

reaching his decision and discounting Plaintiff's subjective complaints. The ALJ noted

Plaintiff reported her pain treatment improved her everyday functioning. (Tr. 47). The

ALJ noted Plaintiff's complaints of pain were, in Dr. Spight's opinion, not consistent

with a mechanical spine disorder. (Tr. 48). The ALJ also noted that Plaintiff maintained

employment as a cashier through the first year of her alleged disability. (Tr. 53).

As discussed above, Plaintiff reported living in a private home, completing a range

of chores around the home, an ability to perform personal care needs, no difficulties

handling her finances, an ability to drive a car, partaking in motorcycle rides, maintaining

a relationship with her significant other, daughter, nieces, and childhood friend, an ability

to drive, and completing crossword puzzles. At the administrative hearing, independent medical expert Dr. Andrew Steiner testified that Plaintiff could perform light work with no ladders, ropes, or balancing activities, no more than occasional overhead reaching, and occasional bending, twisting, and crouching. (Tr. 82–83). These daily activities and functional restrictions, or lack thereof, detract from Plaintiff's subjective complaints.

The Court finds that the ALJ gave full consideration to all the evidence presented and properly considered the *Polaski* factors prior to discrediting Plaintiff's subjective complaints. *Gregg*, 354 F.3d at 714. The ALJ's decision makes clear that he properly considered the record before him in making his RFC determination, and that decision was supported by substantial evidence. *Strongson*, 361 F.3d at 1072. Moreover, even if "it is possible to draw two inconsistent positions from the evidence and one of those positions represents the [ALJ's] findings, the court must affirm the [ALJ's] decision." *Pearsall*, 274 F.3d at 1217. The ALJ's determination in this case was supported by good reasons and substantial evidence. *Pelkey*, 433 F.3d at 578. Therefore, the Court finds the ALJ properly assessed Plaintiff's subjective complaints.

[Continued on next page.]

## IV.    CONCLUSION

Based upon the record, memoranda, and proceedings herein, and for the reasons stated above, **IT IS HEREBY ORDERED** that Plaintiff's Motion for Summary Judgment, (ECF No. 18), is **DENIED**, Defendant's Motion for Summary Judgment, (ECF No. 20), is **GRANTED**, and this matter is **DISMISSED**.


**LET JUDGMENT BE ENTERED ACCORDINGLY.**


Date: March 21, 2018                                        _____*s/ Tony N. Leung*_____
                                                                          Tony N. Leung
                                                                          United States Magistrate Judge
                                                                          District of Minnesota

                                                                          *Engquist v. Berryhill*
                                                                          Case No. 16-cv-3951 (TNL)